942 F.2d 790
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re AMERICAN RESOURCES CORPORATION, Debtor.
Ronald L. DURKIN, as Chapter 7 Trustee of the bankruptcy
estate of American Resource Corporation, Plaintiff-Appellee,
v.
Sherman MAZUR, Michelle V. Mazur, Adele Kaplan, as Trustee
of Mazur Family Trust, American Realty Resources,
Inc., Tatco Investments, Inc., Colonial
Service Corporation,
Defendants-Appellants.
 No. 90-55529.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 3, 1991.
Decided Aug. 23, 1991.
 
 Before BOOCHEVER, KOZINSKI and O'SCANNLAIN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Sherman Mazur, Michelle Mazur, Adele Kaplan (as trustee of the Mazur Family Trust), and three companies Sherman Mazur controlled, TATCO, ARRI, and Colonial [hereinafter Mazur] appeal both the granting of a preliminary injunction against them which prohibits the transfer or encumbrance of listed assets and the issuance of writs of attachment against Mazur's two houses. We affirm.
 
 BACKGROUND
 
 3
 American Resource Corporation [ARC] was taken into Chapter 7 bankruptcy by its creditors on April 5, 1989. ARC converted the case to Chapter 11. In its bankruptcy statement of affairs, Sherman Mazur was listed as chairman of the board and chief executive officer. On October 10, 1989, the bankruptcy court converted the case back to involuntary bankruptcy, and appointed Ronald Durkin, a former FBI agent, CPA, and financial fraud investigator, as Trustee.
 
 
 4
 The Trustee sought a complete turnover of ARC's books and records. ARC failed to comply fully with this request prior to the preliminary injunction hearing upon which this appeal is based. The Trustee conducted a Rule 2004 examination of Mazur, who invoked the fifth amendment, refusing to answer questions on critical matters. The Trustee also subpoenaed bank records of all relevant parties but Mazur's counsel instructed the banks not to comply.
 
 
 5
 The Trustee's position essentially was that "Mazur and his affiliates looted ARC's predecessor TATCO, then consolidated TATCO with ARC, then looted ARC, and, during ARC's collapse, fraudulently transferred assets acquired during this history of looting into the Mazur Family Trust. [The Trustee] alleged that this looting occurred through breaches of fiduciary duty and fraudulent transfers ..."[1]
 
 
 6
 As provisional relief, the bankruptcy court granted the Trustee's request for a preliminary injunction proscribing the transfer or encumbrance of listed assets and also ordered the issuance of writs under California law attaching Mazur's two luxury homes. The court did make clear, however, that it would entertain a motion by Mazur to release property if the injunction were to become "onerous," noting that Mazur was "certainly entitled not to have the trustee interfere ... with the money that he needs to live, to support his family, to pay his taxes, to pay his attorney's fees and that type of thing ..." The district court approved the bankruptcy court's decisions to enjoin and order attachment. Mazur appeals, contending there was insufficient evidence of any wrongdoing to warrant the relief granted.
 
 DISCUSSION
 I. PRELIMINARY INJUNCTION
 
 7
 In this circuit, "a party seeking a preliminary injunction must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips in its favor." Hunt v. National Broadcasting Co., 872 F.2d 289, 293 (9th Cir.1989) (citation omitted). While the bankruptcy court appeared to rely on the "probability of success" articulation, we can uphold the judgment of the court below on any ground supported by the record. See Smith v. Block, 784 F.2d 993, 996 n. 4 (9th Cir.1986). Given the circumstances of this case, we prefer to examine the propriety of the injunction under the "serious questions" articulation.[2]
 
 A. Balance of Harms
 
 8
 Mazur made no contention whatsoever that he would have been harmed by the injunction being granted. Yet, there was plenty of evidence of potential harm to the estate. Without the granting of provisional relief, there would have been a risk of fraudulent transfer of estate assets. The court properly relied on the transfers of Mazur's two luxury homes into an irrevocable family trust as evidence of that risk. The court found that those transfers were probably made to hinder or defraud ARC and other creditors. This finding is not clearly erroneous in light of the several attendant 'badges of fraud.' The transfers were made (1) without consideration, (2) into a trust of which Mazur was beneficiary, (3) at a time when both his company was collapsing, (4) and massive claims against him could be expected (and did materialize), and (5) the trust was a spendthrift trust, typically designed to hinder creditors. Mazur offers no legitimate explanation as to why the transfers occurred. Indeed, Mazur refused to answer whether he had secreted assets in the past, or was doing so at the time of ARC's bankruptcy proceeding.
 
 
 9
 Evidence of lawsuits against ARC (at least one of which had already been reduced to judgment of over $200,000) supports the possibility that these potential judgment creditors would attach, or otherwise place liens upon, estate assets. Mazur also has a pending dispute with the IRS over tax years 1982-88, although no assessment has been made. In addition, the California Franchise Tax Board has recorded a lien against Mazur for unpaid 1987 taxes.
 
 
 10
 Altogether, these factors tip the balance of harms decidedly in Durkin's favor, particularly in light of Mazur's complete failure to allege any countervailing harm. Furthermore, the court's reasonable and flexible approach with respect to Mazur's access to assets would make proving hardship all the more difficult for him. See supra.
 
 
 11
 B. "Serious Questions"
 
 
 12
 Given that the balance of harms tips so decidedly in the Trustee's favor, to affirm we must only conclude that the lower court did not abuse its discretion in finding sufficient evidence that the Trustee's claims raise "serious questions." See Marcos, 862 F.2d at 1362. We find that there were, at the very least, "serious questions" raised by the Trustee's complaint.
 
 
 13
 First, there was a rapid dissipation of ARC's $19,000,000 net worth.[3] Second, there was evidence of seven unexplained transfers between ARC and Mazur and the affiliated entities, and $203,000 in unexplained cashier's checks. Third, evidence was presented that Mazur acquired significant luxury assets during his companies' financial collapse.[4] Fourth, testimony of both Alastair Gamble, a former Mazur accountant, and Robert O'Brien, a former financial officer at ARC, is damning.[5] Fifth, there was evidence that Mazur had been withdrawing $200,000 to $300,000 a month from ARC.[6] Sixth, there was "other act" evidence of mismanagement and potential looting of TATCO while under Mazur's control. We find the acts similar, not too remote in time from one another, and related to a central issue in this case. Finally, we believe a jury could find that, given the evidence, Mazur mismanaged or looted TATCO, or both.[7] See United States v. Miller, 874 F.2d 1255 (9th Cir.), reh'g denied, 884 F.2d 1149 (9th Cir.1989). Seventh, O'Brien's resignation, both because of his doubts ARC could survive as a going concern and because of "various improprieties ... with respect to the handling of cash and cash matters at [ARC] and because of [his] concern for the negative impact that such activities might have on [his] personal reputation," corroborates the allegations of misconduct. Finally, Mazur's refusal to answer questions regarding ARC's June 1 financial statement and bankruptcy schedules, whether the Trustee had received a complete turnover of documents, whether Mazur had made a fraudulent transfer of his assets during 1987, and whether he was in the process of transferring or encumbering his assets, coupled with his failure to produce all requested documents allowed the court permissibly to indulge adverse inferences. To draw an adverse inference from the refusal to testify in a civil context sufficient independent evidence must exist. Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). We believe it does.
 
 
 14
 In sum, because we find both that "serious questions" were raised by the Trustee's evidence of looting and mismanagement and that the balance of harms tips decidedly in the Trustee's favor, we conclude that the preliminary injunction was properly granted.
 
 II. PROPRIETY OF WRITS OF ATTACHMENT
 
 15
 Bankruptcy Rule 7064 incorporates Fed.R.Civ.P. 64, authorizing provisional remedies in accordance with state law. Here, once the bankruptcy court found the injunction warranted, it also ordered attachment, pursuant to California law, of Mazur's two homes which had been transferred into an irrevocable family trust in 1987. While the Trustee cites three independent bases for attachment, we find attachment appropriate under the first and, therefore, need not address the other bases.
 
 
 16
 California Civil Code § 3439.07(2) allows for the attachment of an asset in an action for relief against a fraudulent transfer. Section 3439.04(a) provides that a transfer is fraudulent, and hence the subject of the transfer attachable, if done with "actual intent to hinder, delay, or defraud any creditor of the debtor." Having found the transfer accompanied by sufficient 'badges of fraud,' we conclude that the court did not abuse its discretion in granting the attachment.
 
 
 17
 Mazur claims that transfer to a relative "has not been regarded as a badge of fraud sufficient to warrant avoidance when unaccompanied by any other evidence of fraud." But neither the court, nor the Trustee relied on that factor alone. Combined with other factors, transfer to a relative is significant. While Mazur correctly notes that a court may consider the indicia negativing, as well as indicating, fraud, the indicia of fraud are sufficient here.
 
 CONCLUSION
 
 18
 Because the balance of harms tips decidedly in the Trustee's favor, and because there was sufficient evidence to raise "serious questions" with respect to the Trustee's allegations of mismanagement, looting, and fraud, we affirm the decision to enjoin Mazur from transferring or encumbering the assets listed in the court's order. We also affirm the issuance of writs of attachment on the two homes.
 
 
 19
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The claims against Mazur include: (1) breach of fiduciary duty; (2) breach of contract for failure to act loyally and with reasonable care; and (3) perpetration of fraudulent transfers. In addition, the Trustee made requests for substantive consolidation; equitable subordination; the imposition of a constructive trust; and the turnover of property
 
 
 [2]
 Adopting the "serious questions" articulation, which relaxes the standard for success on the merits, is justified in several respects. First, this case involves complex financial transactions among several interrelated companies. Second, the evidence thus far produced fails to paint a complete picture of the relevant transactions or relationships at issue. Third, Mazur's alleged withholding of evidence that should have been turned over to Durkin makes showing a probability of success far more difficult. Last, the invocation of the fifth amendment by Mazur and others similarly complicates the case. The "serious questions" articulation appears to have been formulated precisely for such complex, fact-intensive matters. See, e.g., Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir.1988) (en banc ) (" '[S]erious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo.")
 
 
 [3]
 ARC was incorporated in April, 1986. Its financial statement of June 1, 1986 showed a net worth of $19,000,000. That figure was cited as an accurate representation of the company's financial strength to two entities with whom ARC had dealings, based, among other things, on their reliance on the accuracy of that portrait. By the time it was brought into bankruptcy, ARC had a net worth of $-2,800,000. Even if Mazur's explanation for this phenomenon--that the June 1 balance sheet overstated ARC's worth because it included contingent assets accounted for on an appraised, not cost, basis--is to be believed, it would constitute sufficient mismanagement to raise "serious questions" on the breach of fiduciary duty and breach of contract claims. As the court found, nearly all the unrelated third parties which sold properties to ARC later sued or took rescission action, in some cases requiring ARC to pay huge settlements
 
 
 [4]
 At least $130,000 in jewelry was purchased after ARC was experiencing serious financial difficulties. Also, Mazur's $4,500,000 Holmby Hills home, for which he put $1,500,000 down, was purchased around the time that ARC developed its financial difficulties. While he lists the banks upon which the downpayment checks were drawn, he fails to account for the money's source. Taken in context, the acquisition of such extravagant luxury items contemporaneously with the financial demise of Mazur's companies could give rise to the inference of looting
 
 
 [5]
 Gamble stated that "[Mazur] became obsessed with the idea that the accrued fees that were being charged to the partnerships were basically his money"; Mrs. Mazur's overdrafts were taken care of out of corporate funds; Mazur borrowed money from the company and then periodically paid himself fees which he used to reduce the loan; and many payments were made to MMP Construction, a company that belonged to an ARC employee, Ron Cooper, particularly around the time Mazur's Laguna house was being constructed. O'Brien's testimony corroborates this last assertion. O'Brien was specifically told by a subordinate in charge of cash management at ARC that ARC was paying both for construction on the Laguna home and for the house staff's salaries. O'Brien testified he was informed that Cooper was spending half his time overseeing the work done on the Laguna home, and that he was receiving $10,000 a month from ARC and $5,000 a month from TATCO
 
 
 [6]
 Mazur contends that this part of O'Brien's testimony is impermissible hearsay because it was based upon statements made to him by others. O'Brien testified, however, that he confronted Mazur with these revelations and that "Mazur reluctantly agreed to set up a separate entity which he would use to pay all personal expenses from instead of running them through ARC, to reimburse ARC for his personal payroll items once this entity was set up, to take over such personal payroll items through such entity and to set himself up through this entity on a set draw of $100,000 per month." By so agreeing, Mazur made an implied admission. See Fed.R.Evid. 801(d)(2)(B) (statement of which party has manifested an adoption or belief in its truth)
 
 
 [7]
 Within three years of Mazur's acquisition of TATCO, it developed serious financial problems. Coupled with the evidence of deception and fraud, it supports the inference of mismanagement and even looting. For example, "[b]y 1985, the numerous partnerships affiliated with TATCO were filing bankruptcy on nearly a daily basis." Nonetheless, the partnerships continued to sell investments in themselves without disclosing the bankruptcies. Indeed, MacLachlan, who marketed the sales of interests in the partnerships, confronted Mazur's partner, Ruiz, on the failure to disclose. When he was told to turn a blind eye and refused, and when Ruiz refused to make the disclosures, MacLachlan resigned. MacLachlan Decl. P 6, 9 In addition, there was evidence, which the court accepted, of TATCO's commingling funds under Mazur. To all this, Mazur made no significant response. Moreover, he did not specifically contest the court's reliance on 404(b) evidence